IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

JANENINA DAVIS,                        §
                                       §
                    Plaintiff,         §
                                       §   Civil Action No. 3:18-CV-0986-D
VS.                                    §
                                       §
REALPAGE, INC.,                        §
                                       §
                    Defendant.         §

MEMORANDUM OPINION
AND ORDER

Plaintiff Janenina Davis ("Davis") sues her former employer, defendant RealPage, Inc.

("RealPage"), alleging that she was discriminated against based on her African-American

race and Kenyan national origin, subjected to a hostile work environment based on her race

and national origin, and retaliated against after she complained about discriminatory conduct,

in violation 42 U.S.C. § 1981 and the Texas Commission on Human Rights ("TCHRA"),

Tex. Labor Code Ann § 21.001 *et seq.* (West 2015). RealPage moves for summary judgment

on all claims. For the reasons that follow, the court grants the motion and dismisses this

action with prejudice.[1]

_____

[1]Although each side filed its appendix under seal, and this memorandum opinion
quotes portions of the sealed appendixes, the court has determined that this memorandum
opinion should not be filed under seal.

I

Davis is an African-American United States citizen who was born in Kenya, wore braided hair while employed at RealPage, and spoke with an accent.[2] In July 2015 she began working through a staffing agency for RealPage, a global provider of software and data analytics to the rental property management industry. Davis was hired as a permanent employee in December 2015. RealPage terminated Davis' employment on April 3, 2017.

Davis worked for RealPage as a disputes investigator, reviewing screening reports disputed by persons whose apartment applications had been denied based on the reports. Disputes investigators provided their investigation findings to the Operations Department ("Operations"), advising whether the screening reports were accurate. Jennifer Castillo ("Castillo") was the only other disputes investigator for most of Davis' tenure. As the court explains below, *see infra* § III(D)(2), a reasonable jury could only find that Castillo is also African-American.

Davis' supervisor was Raymond S. "Stan" McCoy, III ("McCoy"), a data acquisition supervisor in the OnDemand Screening ("Screening") Department. Screening worked closely with Operations. McCoy recommended Davis for employment with RealPage and initiated her hiring.

_____

[2]In deciding RealPage's motion for summary judgment, the court views the evidence in the light most favorable to Davis as the summary judgment nonmovant and draws all reasonable inferences in her favor. *See, e.g., Owens v. Mercedes-Benz USA, LLC*, 541 F.Supp.2d 869, 870 n.1 (N.D. Tex. 2008) (Fitzwater, C.J.) (citing *U.S. Bank Nat'l Ass'n v. Safeguard Ins. Co.*, 422 F.Supp.2d 698, 701 n.2 (N.D. Tex. 2006) (Fitzwater, J.)).

Davis maintains that she acted professionally as a RealPage employee in her dress, manner, and interaction with coworkers, and that McCoy recognized her for several areas of excellence. She posits that April Herman ("Herman"), an operations specialist who had many opportunities to review her work, also found her to be a hard worker who did high quality work was.

According to Davis, despite her exemplary job performance, she was the victim of discrimination based on her race and national origin, and subjected to a hostile work environment based on race and national origin, and then retaliated against when she complained. In support of these claims, Davis posits the following in her summary judgment response brief.

Becky Boyst ("Boyst"), the Supervisor of Operations and Davis' indirect supervisor, gave Davis research assignments but only communicated with her via messages sent through others. Although Boyst did not directly supervise, or communicate with, Davis, she paced around Davis' desk and made comments to McCoy to try to hurry Davis unnecessarily. Boyst directly communicated with Castillo about assignments, and did not pace around Castillo's desk.

In January 2016, shortly after Davis became a permanent employee, the harassing conduct of coworkers began. Charles Cyres ("Cyres") began following Davis up to three times per day when she went for walks outside while on break. Cyres was a member of Operations and is also African-American (but not Kenyan). He reported directly to Jeffrey Kennedy ("Kennedy"), who was under Boyst. Sometimes Cyres would be waiting for Davis

in the parking garage when she got to her car, which made her feel physically threatened.

At least twice, when Davis was about to leave her desk, she received an instant message from Castillo stating that Davis was about to leave. On one of those occasions, Davis observed Cynthia Maple ("Maple"), a team lead in Operations, looking at her. Davis concluded that Castillo was sending messages to Boyst's team so they could follow Davis. Maple, like Davis and Castillo, is also African-American.

Boyst and some of her subordinates interacted differently with Davis than with other employees: in the morning they would greet each other but not greet Davis; they generally were not as friendly to Davis; and they excluded Davis from social get-togethers. Tonya Bagsby ("Bagsby"), an operations specialist, told Herman that she thought Davis was strange and odd. Bagsby is also African-American.

In March, Boyst, Castillo, Cyres, Kennedy, Ann Khulik ("Khulik"), and three others tried to intimidate Davis by taking turns following her on her walk break, to the restroom, and to the escalator. Boyst did not attempt to determine whether any of her team members were following Davis.

During the summer of 2016, Davis wore her hair in a traditional African hairstyle consisting of "twisted" braids. Manager Bruce Bishop ("Bishop") made offensive comments regarding her hair braids, approached McCoy, and began laughing. McCoy also instructed Davis not to write "Done" on her completed files, and he said she may have used that word because of where she comes from.

In April and May 2016 Boyst and her team members falsely accused Davis of work

errors, including omitting documents from a case report. Davis was not notified that the documents had been found until after she complained to McCoy and he followed up about the alleged mistakes. On another occasion, Davis reported that an applicant was innocent, but someone changed the file to reflect the disposition as guilty. McCoy discovered—and Boyst admitted—that Maple (Boyst's team lead) had changed the file. In May 2016 Boyst and Maple reported to McCoy that Davis had contacted a customer and inaccurately reported the case as complete when she had not.

Davis maintains that the harassment continued from January 2016 into the summer. Cyres walked behind Davis when she took a break for a daily walk outside. In June 2016 Davis complained to Shiri Bibliowicz ("Bibliowicz") about the harassment by her coworkers. In response to Davis' statement that she felt completely uncomfortable and was being silently harassed to the point of a hostile environment, Bibliowicz told Davis to ask Cyres why he was following her. Because Davis was uncomfortable doing this (she was afraid of how he might react), she immediately reported the conduct to Global Human Resources ("HR"), and, around that time, reported it to McCoy, her supervisor. After Davis informed McCoy that she was sure she was being followed, McCoy instructed her to confront Cyres, but Davis was uncomfortable doing so. McCoy discussed this with Pat Bonner ("Bonner"), Director of Operations, who said that Cyres denied the allegations.

HR declined to investigate or interview Davis, even after admitting that there might be information that could enable HR to better understand the context of the environment or the reasons Davis believed that a leader would instruct her staff to act this way. HR advised

Davis to bring this to the attention of her supervisor for resolution at the department level, and, if unresolved there, then to HR to help with a resolution.

According to Davis, the harassment worsened after she made the report to HR. Those who had previously followed her were following her to the restroom, waiting for her in the parking lot, and waiting for her in the elevator. Sometimes, when Davis returned to her desk, persons would burst out laughing and say, "Oh, just checking." P. Br. 10. This occurred approximately twice a day, every other day, for approximately six months. McCoy often worked from home, and the harassment of Davis would escalate when he was gone.

In approximately June 2016, Bagsby, who sat next to Cyres, began following Davis. Approximately every other day Bagsby would park in front of Davis' car, sit in her own car, and stare at Davis when Davis exited her car. Davis did not confront Bagsby because she is not confrontational and was afraid Bagsby might report her and misrepresent what she had said.

The harassment sometimes caused Davis to go to the company wellness center room and cry and pray. The harassment and retaliation caused Davis insomnia and weight loss, and she became quieter when interacting with her family. Davis complained to Herman that other employees in Operations were intentionally following her. Davis was very upset and concerned and visibly distressed and distraught by this conduct.

In or about August, Davis complained again to McCoy about continued harassment and a hostile work environment, but the only action he took was to discuss it again with Bonner. When McCoy stated that he thought "this thing was over," and Davis responded

that it was not, McCoy asked her whether she was on antidepressants, stating that people on antidepressants think they are being followed.  *Id.* at 11.  McCoy also advised Davis to ignore the harassers and concentrate on her work, and that she was doing very well.  After that, McCoy's attitude toward her (which had been conversational) changed.  McCoy admitted that he asked Davis if she were taking medications that would have caused any side effects, admitted that Davis said that having other employees follow her was causing her stress, and admitted that at some point Davis complained to him about retaliation.  McCoy did not believe it was harassment because no one had said anything to Davis or impeded her from moving anywhere.

On November 14, 2016, after telling Davis numerous times that she was doing an outstanding job, McCoy put her on a performance improvement plan ("PIP"), without advance notice.  Davis was surprised by the PIP because, as recently as the month before, McCoy had told her she was doing a good job.  McCoy had not previously issued Davis any written warnings.  RealPage produced only one email from McCoy to Davis pointing out an error, and McCoy brought minor issues to Davis' attention only a couple of times.  RealPage's progressive discipline policy provides for verbal and written warnings before placing someone on a PIP, and provides that a PIP is not to exceed 90 days.

McCoy admitted having to work with and train all disputes investigators along the way to prevent mistakes, not just in the beginning of their employment, and that all disputes investigators made mistakes.  Castillo made mistakes, including incorrect and incomplete investigation responses and incorrect information on reports.  McCoy had put others on PIPs

or warnings but had not terminated them. Irate consumer calls resulted from the work of all disputes investigators, not just Davis.

The PIP indicated termination at 45 days if improvement were not shown, but Davis was not terminated at the end of the 45 days even though, according to McCoy, she really was not showing much progress. But McCoy changed his testimony when shown Davis' 2016 annual evaluation, in which he stated that Davis had shown improvement in certain areas at the end of 2016.

Davis went on a pre-approved leave of absence to Kenya shortly after the initiation of the PIP and was gone for approximately the month of December. Under RealPage policy, employees must apply for a leave of absence, and "job performance" is considered when deciding whether the request should be approved. *Id.* at 14. McCoy admitted that he would not have recommended approval without taking job performance into consideration.

On or about March 1, 2017 Davis received her annual evaluation for 2016. McCoy gave her an "Overall Rating" of 2.50, which on the numerical rating scale is halfway between "Approaches Standards" and "Meets Expectations." *Id.* Davis did not receive any "Needs Immediate Improvement" ratings. *Id.* The only persons who had input into the review were McCoy and Debra Stockton ("Stockton"), Vice President Screening.

McCoy said numerous positive things about Davis' performance.[3] She received

---

[3]McCoy stated that Davis met her assigned goals regarding completing consumer disputes within designated timelines; she had excellent attendance, exerted good effort, and worked extra hours; she responded promptly to expedited requests to appease irate consumers; she strove to produce positive results; she established a good relationship with

"Meets Expectations" ratings on two of five sections in the evaluation (Client Focus and Process Improvement), and "Approaches Standards" on the other three (Assigned Goals and Tasks, Collaboration and Competency). The evaluation covered the entire year of 2016. Regarding incorrect responses and accuracy and completeness issues, McCoy admitted that, after implementation of the PIP in November, Davis showed improvement in those areas at the end of 2016. He also admitted that new investigative tools were implemented in 2016, and that there was a large learning curve to the job. When Davis told McCoy that she disagreed with the "Approaches Standards" ratings and that she was surprised to receive this rating because in 2016 he told her she had been doing a good job, McCoy responded that Davis should not worry, that RealPage was starting to do formal reviews, and that almost everyone in the building was complaining about it. McCoy told Davis that she needed to improve some things but was doing well.

McCoy wrote that Davis struggled in establishing relationships internally and did not always maintain the necessary open communication with the Operations team. McCoy could not recall why he wrote this, and he testified that he had not received any complaints from Davis' coworkers about her and could not recall whether he had received any from Boyst.

_____

data providers and effectively communicated results of her own research to aid in improving the accuracy of their data; she did a good job following up on requests submitted to data providers to obtain timely responses; she adapted well to numerous changes in processes throughout the year; she learned to effectively use the Onesite interface and new record suppression tool; she worked with data providers to test and implement their new web interface for submitting research requests; and she showed a willingness to succeed and devoted extra time on the job to complete her assignments and successfully researched sources for the information necessary to complete investigations.

On October 28, 2016 Castillo angrily confronted Davis, shouted at her in a raised voice, referred to her as "stupid" and "paranoid," and said that Boyst's department did not want to deal with her. Davis complained to Toni Glosson ("Glosson") in HR. In McCoy's absence, Stockton emailed Glosson that she was going to discuss with McCoy any other issues with Davis and then follow up. There is no evidence that Castillo was to be similarly investigated.

In February 2017 the harassment worsened. When Davis went to the parking garage to go home or to lunch, she sometimes noticed Cyres or Kennedy sitting in his car. This scared Davis, and she started asking the security guard to escort her to her car.

Davis submitted an intake questionnaire to the equal Employment Opportunity Commission ("EEOC") on February 16, 2017,[4] alleging national origin discrimination. On or about February 17, 2017 she also requested to meet with an HR Manager at RealPage. Heather Hepler ("Hepler"), Senior Director Human Resources, answered her request.

Davis sent Hepler an email on February 27, 2017, in which she complained of harassment, discrimination based on her national origin, and retaliation. Davis told Hepler that she felt the harassment had created a hostile work environment and a violation of her personal space; that it was not only affecting her personally but affecting her job performance and her life; and that she had contacted the EEOC to file a charge of discrimination shortly

---

[4]The EEOC Intake Questionnaire was stamped as received by the EEOC on February 16, 2016, P. App. 344, but this is a mistake. *See id.* at 347 (reflecting "2-16-2017" as date Davis signed form).

before sending Hepler the email to set up an appointment. Hepler advised McCoy that Davis had complained to her that Operations employees were following her during breaks.

When Davis and Helper met, Hepler was dismissive of Davis' complaints. Helper said that she had worked with Bonner and Boyst, that they were fine managers, and that she did not know how they would do what Davis alleged. Davis complained during the meeting about race discrimination, requested an investigation, and asked that someone come to the department, sit somewhere inconspicuous, and observe the harassment. After initially declining this request, Hepler sent someone who, according to Hepler, observed the department for almost one hour and witnessed nothing unusual.

Hepler communicated with Bibliowicz, Felicia Taylor ("Taylor"), and Glosson about Davis' complaint and solicited all the "history" that they had on Davis. Hepler admitted that the history was not relevant to the investigation but was just solicited as an FYI. Regarding Davis' June 2015 complaints, they felt there was nothing more to do at that time. When Hepler first heard Davis' complaints that she was being followed, Hepler thought it was unlikely that this was occurring.

After receiving Davis' February 27, 2017 complaint, Hepler and Davis met. Hepler then spoke with McCoy, and they discussed the fact that Davis had been on a PIP. At that point, Davis had not received a written warning, just a PIP. Hepler spoke to Bonner, Boyst, and possibly Kennedy, but does not recall talking to Cyres. No employee was disciplined based on Davis' complaints because Hepler determined they were unfounded.

Herman, a member of Boyst's department and coworker of Boyst and Kennedy, was

never interviewed about Davis' complaints or whether she had observed any harassment in the department. Hepler reviewed Davis' PIP when investigating Davis' February 27 complaint. After the fact of Davis' PIP, Hepler tried to assert that written warnings and PIPs are similar written documents and similar in their level of significance and importance. Hepler did not know the result of the November 2016 PIP, but she admitted it would have been important to know during the termination process.

On March 1, 2017 Davis complained in an email to Hepler that employees were going out of their way to walk by Davis' desk and distract her. Davis unsuccessfully requested that her desk be moved.

On March 2, 2017 Hepler notified Davis that HR had determined there was no indication that anyone listed in Davis' February 27, 2017 email was following her. Hepler stated that it was her understanding that similar allegations had been made in 2016 and had resulted in the same findings, and that if Davis had concrete evidence of individuals following her then the matter would be readdressed, but that the matter was considered closed. Hepler did not mention any finding or conclusions as to Davis' complaints of hostile environment, harassment, national origin discrimination, or retaliation, but she admitted that it would have been a violation of RealPage policy had the things that Davis was complaining about been occurring. Davis responded to Hepler, reiterating that she believed the continued harassment was in retaliation for her having complained to HR in 2016, and because of her national origin.

On or about March 3, 2017 Davis notified Helper by email that Corey McLaurin

("McLaurin"), who is also African-American, had followed Davis to the coffee station twice, and that two other Operations department employees were following her. Davis told Hepler that she had already filed a charge of discrimination with the EEOC. Hepler, in turn, forwarded to RealPage's attorney Davis' email about having filed an EEOC charge. Hepler did not investigate this complaint because she considered it part of the initial, closed investigation.

On March 15 and 17, 2017 Davis made additional complaints to Hepler about being followed. She copied McCoy on the March 15 complaint, in which she stated: "The harassment has continued . . . . I do plan to take a Personal day off soon to go to the EEOC office to pursue this issue. No employee should be subjected to work in such hostile work environment!" P. App. 369-370. McCoy admitted that, when he received this email on March 15, 2017, he knew that the EEOC handles employee issues of discrimination conduct, equal opportunity employment, and harassment issues. Hepler did not investigate Davis' March 15 or 16 complaints and did not look into her complaint about McLaurin. On March 17, two days after Davis advised them that she was going to go to the EEOC, Hepler and McCoy met to discuss "next steps" regarding Davis. *Id.* at 382. Having received no assistance from HR, Davis decided that she should ask the employees if they were following her, and why. Davis noticed Cyres following her on March 15 and asked him. Maple witnessed this and reported it to Hepler.

On Saturday, March 18, Davis and McLaurin were working in the office together. McLaurin followed Davis down the hall, so she followed him to a conference room. She

waited outside while he was talking in the conference room, intending to ask him why he was following her. When McLaurin came out he saw her standing there, he shrugged and walked away. Davis did not say anything to him, but McLaurin reported the occurrence to Bonner, Boyst, Maple, Kennedy, and HR. Despite Bonner's urging him to leave, McLaurin stayed and worked through the end of the day. Hepler reached out to Kennedy and Cyres immediately to "get their point of view," assuring Bonner that she would do so. *Id.* at 386.

On March 18 Bonner emailed Hepler, asking what steps could be taken regarding Davis' actions that day. On Monday, March 20, Hepler responded that she and McCoy had already discussed "next steps" on March 17, the preceding Friday. They then prepared a "written warning," dated March 21, citing Davis for "misconduct" for the alleged incident involving McLaurin. Hepler testified that McCoy found Davis' complaints to be disruptive, which he denied. McCoy also denied that anyone else in the department had indicated that he or she thought Davis' complaints were disruptive. McCoy admitted that, before writing up Davis for the March 18 incident, he did not talk to any of the employees who complained about her. RealPage's counsel was involved in the discussions regarding the warning. McCoy could not say with certainty that he did not discuss termination of Davis with Hepler on March 21, or whether it would have been a good idea to have another write up in the file before terminating her.

Following further consultation between Hepler and RealPage's counsel, Davis was terminated on April 3, 2017. The termination was recommended by McCoy and approved by James Hilliard ("Hilliard") (who had succeeded Stockton as Vice President Screening)

and Hepler on March 30.

On March 31, 2017 McCoy emailed Hepler asking if they could move forward with Davis' termination based on performance issues or whether he needed more or different types of incidents or a longer time period of monitoring. The official records indicate "performance/behav/attendance" as the reason for Davis' termination, and that she is not eligible for rehire.

Davis maintains that a new hire came onboard shortly before Davis was terminated, and that McCoy had this person sit with Davis and observe her work. McCoy testified that Yolanda Wilson transferred into disputes investigation from another RealPage department in February 2017 because they needed investigators. Davis contends that Lee Castiglione ("Castiglione"),[5] who is Caucasian, replaced Davis.

During her time at RealPage, Hepler handled another employee complaint of stalking, which included a complaint that a couple of people in the Screening department were following them. Bonner was the manager of the employees who were accused of this conduct. In that case, too, Hepler dismissed the complainant's allegations, and the complainant was fired shortly after the investigation of the complaint. Hepler participated in the termination proceedings for that complainant. Hepler cannot recall whether the employees in Boyst's department receive annual harassment and discrimination training.

_____

[5]Castiglione's first name appears in various forms in the record. Because Davis refers to Castiglione as "Lee Castiglione" in her brief, P. Br. 22, and McCoy refers to her as "Lee Castiglione" in his deposition, *see* D. App. 56, the court will also refer to her by that name.

During her period of employment there, RealPage did not give her any specific training in HR Management.

Davis now sues RealPage under the TCHRA and § 1981 for race-based and national origin-based discrimination and hostile work environment, and retaliation. RealPage moves for summary judgment, and Davis opposes the motion.[6]

II

When a party moves for summary judgment on claims on which the opposing party will bear the burden of proof at trial, the moving party can meet its summary judgment obligation by pointing the court to the absence of admissible evidence to support the nonmovant's claims. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party does so, the nonmovant must go beyond her pleadings and designate specific facts showing there is a genuine issue for trial. *See id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). An issue is genuine if the evidence is such that a reasonable jury could return a verdict in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmovant's failure to produce proof as to any essential element of a claim renders all other facts immaterial. *See TruGreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.). Summary judgment is mandatory if the nonmovant fails to meet this burden. *Little*, 37 F.3d

_____

[6]Davis' brief does not contain a table of authorities, as N.D. Tex. Civ. R. 7.2(d) requires. *See* P. Br. 3. Although the court has not ordered the brief unfiled or corrected, this failure to comply with the local civil rules should not be repeated in other cases.

at 1076; *Barnard v. L-3 Commc'ns Integrated Sys. L.P.*, 2017 WL 3726764, at *3 (N.D. Tex. Aug. 30, 2017) (Fitzwater, J.).

### III

The court turns first to Davis' claims for race and national origin discrimination under § 1981 and the TCHRA.

### A

Davis contends that RealPage discriminated against her and terminated her employment based on her race and national origin.

RealPage maintains that Davis' discrimination clams fail as a matter of law because (1) a national origin discrimination claim is not cognizable under § 1981; (2) Davis cannot establish a prima facie case of race or national origin discrimination because she cannot show that she was qualified for the position she held, or that she was treated less favorably than similarly situated comparators under nearly identical circumstances; and, even if Davis can establish a prima facie case under § 1981 and/or the TCHRA, she cannot prove intentional discrimination or that RealPage's legitimate, nondiscriminatory reason for terminating her employment is pretextual, especially considering that the same person who hired her (McCoy) was the person who decided to terminate her, and he knew her race and foreign origin.

### B

Section 1981 provides: "All persons. . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981. This includes "the

performance . . ., and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* § 1981(b). And under the TCHRA, "an employer commits an unlawful employment practice if because of race, color, disability, religion, sex, national origin, or age the employer fails or refuses to hire any individual, or discriminates in any other manner against an individual[.]" Tex. Labor Code Ann. § 21.051. The framework applicable to Davis' race discrimination claims under § 1981 and the TCHRA is the same as applied to Title VII claims. *See LaPierre v. Benson Nissan, Inc.*, 86 F.3d 444, 448 n.2 (5th Cir. 1996) ("Claims of racial discrimination brought under § 1981 are governed by the same evidentiary framework applicable to claims of employment discrimination brought under Title VII."); *see also Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 403 n.2 (5th Cir. 1999) (noting that law governing TCHRA and Title VII is identical). Thus because Davis relies on circumstantial evidence to support her discrimination claims, the claims are properly analyzed under the familiar *McDonnell Douglas* burden-shifting framework. *See, e.g., Smith v. City of St. Martinville*, 575 Fed. Appx. 435, 438 (5th Cir. 2014) (per curiam) (applying *McDonnell Douglas* framework to Title VII claims reliant on circumstantial evidence).[7]

As modified, the *McDonnell Douglas* framework consists of three stages. First, Davis must establish a prima facie case of discrimination, which "creates a presumption that

---

[7]Texas courts construe the TCHRA consistently with federal law interpreting Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* For this reason the court analyzes Davis' claims under the Title VII evidentiary framework and related federal decisions. *See Shackelford*, 190 F.3d at 403 n.2 ("[T]he law governing claims under the TCHRA and Title VII is identical.").

[RealPage] unlawfully discriminated against [her]." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). To establish a prima facie case of discrimination under the *McDonnell Douglas* framework, Davis must show that (1) she is a member of a protected class, (2) she was qualified for the position at issue, (3) she was the subject of an adverse employment action, and (4) she was replaced by someone outside the protected group or was treated less favorably than were other similarly situated employees who were not members of the protected class under nearly identical circumstances. *Hassen v. Ruston La. Hosp. Co.*, 932 F.3d 353, 356 (5th Cir. 2019), *as revised* (Aug. 1, 2019) (citing *Morris v. Town of Independence*, 827 F.3d 396, 400 (5th Cir. 2016)).

Second, if Davis establishes a prima facie case, the burden shifts to RealPage to articulate a legitimate, nondiscriminatory reason for the employment action taken against him. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993). RealPage's burden is one of production, not proof, and involves no credibility assessments. *See, e.g., West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 385 (5th Cir. 2003).

Third, if RealPage meets its production burden, Davis may prove intentional discrimination by proceeding under one of two alternatives: the pretext alternative or the mixed-motives alternative. *See Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004) (age discrimination case). Davis does not rely in her response brief on the mixed-motives alternative. *See* P. Br. 30-31 (arguing that Davis has established that RealPage's asserted reasons for terminating her are pretextual). Under the pretext alternative, Davis must "offer sufficient evidence to create a genuine issue of material fact

. . . that [RealPage's] reason is not true, but is instead a pretext for discrimination[.]" *Rachid*, 376 F.3d at 312 (citation and internal quotation marks omitted).

"Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (alteration in original) (quoting *Burdine,* 450 U.S. at 253).

## C

RealPage contends that Davis' § 1981 claim based on national origin discrimination is not cognizable as a matter of law. This assertion is amply supported in the caselaw, including in a decision of this court. *See Hadad v. Am. Airlines, Inc.*, 2003 WL 292170, at *2 (N.D. Tex. Feb. 7, 2003) (Fitzwater, J.). But because the court is dismissing Davis' § 1981-based national origin discrimination claim on other grounds, it will assume *arguendo* that a § 1981 claim is available.

## D

The court now turns to the burden-shifting framework. RealPage maintains that Davis cannot establish a prima facie case of race or national origin discrimination because she cannot show that she was qualified for the position she held or that she was treated less favorably than similarly situated comparators under nearly identical circumstances. The court will assume *arguendo* that Davis can satisfy each element of a prima facie case—including that she was qualified for the position she held—except the requirement that

she was treated less favorably than similarly situated employees under nearly identical circumstances.

1

Relying on *Bryan v. McKinsey & Co.*, 375 F.3d 358 (5th Cir. 2004), and a decision of the Southern District of Texas, Davis maintains that she can satisfy the fourth prong of the prima facie case simply by showing that she was replaced by someone outside the protected class. She then asserts that because she has established that she was replaced by a Caucasian female, she has satisfied the fourth prong of a prima facie case and need not prove that she was treated less favorably than similarly situated employees outside the protected class.

But Davis has failed to offer admissible summary judgment evidence that the person who replaced her—Castiglione—is Caucasian, as Davis maintains. In her response brief, when specifying (as she must[8]) the summary judgment evidence that supports her assertion that she was replaced by a Caucasian, Davis cites page 444 of her appendix, a document entitled "Laura's Bio." *See* P. Br. 22 (asserting that "Lee Castiglione, Caucasian, replaced Davis," and citing P. App. 444); *see also id.* at 31 (referring to "the replacement of Plaintiff by a Caucasian," and citing P. App. 444). Page 444 appears to be an excerpt of an online

---

[8]*See* Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]"; N.D. Tex. Civ. R. 56.5(c) ("When citing materials in the record, as required by Fed. R. Civ. P. 56(c)(1)(A) or (B), a party must support each assertion by citing each relevant page of its own or the opposing party's appendix.")

background report from "MyLife.com" that states that Castiglione's "ethnicity is Caucasian." P. App. 444.

RealPage objects to this evidence, however, as unauthenticated, "inadmissible hearsay." D. Reply 3. The court sustains the objection. "Evidence on summary judgment may be considered to the extent not based on hearsay or other information not excludable at trial." *Fowler v. Smith*, 68 F.3d 124, 126 (5th Cir. 1995). Davis "ha[s] failed to provide anything to authenticate the document or explain why it should not be disregarded as hearsay." *Thompson v. Bank of Am., N.A.*, 13 F.Supp.3d 636, 655 (N.D. Tex. 2014) (Boyle, J.), *aff'd*, 783 F.3d 1022 (5th Cir. 2015). Because Davis has failed to authenticate P. App. 444 and show that is admissible, either because it is not hearsay or it falls within an exception to the hearsay rule, she has in turn failed to present competent summary judgment evidence that she was replaced by someone outside the protected group. She has therefore failed as well to satisfy the fourth required element for making a prima facie showing of race discrimination based on her termination.[9]

2

As for her race-based discrimination claim based on disparate treatment, Davis posits that she has satisfied the fourth prong of a prima facie case based on evidence that her coworker, Castillo, who she alleges is Caucasian, was treated more favorably than Davis and

---

[9]Because Davis has failed to establish a prima facie case of race discrimination based on her termination, the court need not address the evidence on which Davis relies to demonstrate pretext. *See* P. Br. 31. Nevertheless, because Davis has also failed to raise a genuine fact issue on the issue of pretext, the court will address *infra* at § III(F).

was not disciplined for mistakes that Castillo admittedly made that were the same as mistakes allegedly made by Davis (i.e., incomplete investigation responses and incorrect information on reports); that Castillo made these mistakes even though she was more experienced than Davis; and that McCoy admitted that training disputes investigators is constant and ongoing throughout their employment. Responding to RealPage's assertion that the evidence is undisputed that Castillo made mistakes but did not struggle like Davis did to perform her core job functions, Davis maintains that the evidence on this issue is in fact disputed.

The court holds that Davis has failed to establish the fourth element of her prima facie case because she has not introduced evidence of a "similarly situated employee" who is "not a member of the protected class," and therefore has not shown that she was "treated less favorably than a[n] . . . employee of another race." *Bregon v. Autonation USA Corp.*, 128 Fed. Appx. 358, 361 (5th Cir. 2005). This is so because the summary judgment evidence does not support the finding that Castillo is Caucasian. Instead, the record only supports the finding that she, like Davis, is African-American. When asked, "[W]hat was [Castillo's] race?" Davis responded, "She was mixed. I think black and Spanish, but she, I think identified herself *as African-American*." D. App. 11 (emphasis added). Indeed, Taylor, RealPage's Vice President of Human Resources, averred in her declaration that "RealPage records reflect the following racial background identities of the following employees: Jennifer Castillo (African-American)[.]" *Id.* at 6.

Because Davis has not introduced evidence that she was treated less favorably than were other similarly situated employees who were not members of the protected class, she

has failed to establish a prima facie case that she was discriminated against by RealPage based on her race.

## 3

Davis' national origin-based discrimination claims predicated on disparate treatment and termination fail for the same reasons. Davis has not presented any evidence that her replacement, Castiglione, or that her proffered similarly-situated comparator, Castillo, is non-Kenyan. Despite the apparent ease with which Davis could have met this burden, and the absence of any evidence bearing on the national origins of the other employees, the summary judgment record contains *no* evidence of the national origins of the persons who replaced Davis and would be compared to her. She has therefore failed to satisfy the prima facie case requirements for claims of disparate treatment and termination based on her national origin. *See, e.g., Pourgholam v. Advanced Telemarketing Corp.*, 2004 WL 1283963, at *6 (N.D. Tex. June 9, 2004) (Sanders, J.) (holding that plaintiff failed to make out prima facie case of discrimination based on national origin where summary judgment record "contain[ed] no evidence as to the national origin of the person who replaced Plaintiff.").

## E

RealPage contends that, even if Davis can establish a prima facie case under § 1981 and/or the TCHRA, she cannot prove intentional discrimination or that RealPage's legitimate, nondiscriminatory reason for terminating her employment is pretextual.

Assuming *arguendo* that Davis has made a prima facie showing of race and national origin discrimination, RealPage must produce evidence of a legitimate, nondiscriminatory

reason for the employment decision in question. RealPage contends that "McCoy decided to terminate Davis' employment for failing to meet performance standards" after "she continued making the same mistakes identified in her original PIP while on final warning." D. Br. 9 (quoting D. App. 69). RealPage has introduced proof, including the PIP, Davis' performance review, and the written warning, that Davis did not meet the level of performance her position required. "Poor job performance is a legitimate, nondiscriminatory reason to terminate an employee." *Burton v. Madix Store Fixtures*, 2006 WL 3247329, at *4 (N.D. Tex. Nov. 9, 2006) (Lindsay, J.).

Although Davis challenges the bases for the PIP, performance review, and written warning, "this stage of the burden-shifting scheme does not involve credibility determinations." *Schell v. Companion Data Servs., LLC*, 2019 WL 4536175, at *7 (N.D. Tex. Sept. 19, 2019) (Fitzwater, J.). RealPage's burden is one of production, not proof, and involves no credibility assessments. *See, e.g., id*. Because RealPage has met its burden of producing evidence of a legitimate, nondiscriminatory reason for Davis' termination, "the burden shifts back to [Davis] to make an ultimate showing of intentional discrimination." *Id.* (quoting *Campbell v. Zayo Grp., LLC*, 2015 WL 3903539, at *3 (N.D. Tex. June 25, 2015) (Fitzwater, J.)).

F

1

Davis must now show that the legitimate, nondiscriminatory reason proffered by RealPage "[is] not its true reason[], but [was] a pretext for discrimination." *Reeves*, 530 U.S.

at 143 (quoting *Burdine*, 450 U.S. at 253); see also *EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 615 (5th Cir. 2009). At the summary judgment stage, of course, Davis is only obligated to raise a genuine issue of material fact regarding pretext. *See, e.g., Jackson v. Fed. Express Corp.*, 2006 WL 680471, at *6 (N.D. Tex. Mar. 14, 2006) (Fitzwater, J.) ("Because [defendant] has satisfied its burden to produce a legitimate, nondiscriminatory reason for [plaintiff's] discharge, in order for [plaintiff] to survive summary judgment, [s]he must create a genuine and material fact issue regarding the ultimate question of discrimination.").

2

Davis appears to address in two separate parts of her response brief the evidence she relies on to establish pretext. In one part, under the rubric "Davis Establishes Defendant's Asserted Reasons for Termination are Pretextual," P. Br. 30 (bold font omitted), she asserts that she "presents ample evidence of the pretextual nature of [RealPage's] decision to terminate her," *id.* at 3, and "overwhelming" evidence of pretext, *id.*, including:

> the animus displayed by her supervisor in his comments regarding her origin/race, the fact coworkers who observed her work found it good, the fact [that McCoy] was untruthful about whether he found her protected conduct "disruptive" to the department (Hepler testified he did, but he denied it), the fact [that] a decision to terminate was made prior to the issuance of a written warning purported to precede the termination decision and Hepler's evasiveness about it; the fact McCoy had new transfers into the department sit with Plaintiff and "observe" her work shortly before her termination and concurrent with the period of time he states she so poorly performed; the replacement of Plaintiff by a Caucasian.

*Id.* (internal citations omitted).

Davis also maintains that "infra, [she] presents ample evidence of the pretextual nature of [RealPage's] decision to terminate her [employment]." *Id.* To the extent Davis is referring to a separate section of her brief entitled, "Davis Establishes Defendant's Asserted Legitimate Reason for Terminating her Employment was Pretextual," *id.* (bold font omitted), what she sets out there largely overlaps with the bases on which she relies earlier in her brief: her good job performance; RealPage's alleged failure to follow established procedures and failure to document poor performance; McCoy's alleged dishonesty about whether he found her protected conduct to be disruptive to the department; RealPage's alleged decision to terminate her employment before issuing the written warning; close timing between Davis' complaints and ultimate termination; inadequate investigation of her complaints; and differential treatment between Davis and Caucasian disputes investigators. The court will therefore address in tandem the grounds Davis relies on in both sections of her response brief.

3

Pertinent to her "good job performance," Davis relies heavily on her 2016 annual review, in which she received an overall rating of 2.50—an "Approaches Standards" rating—out of 5. P. App. 265. For example, Davis notes that McCoy stated in the review that Davis "m[et] her assigned goals in completing consumer disputes within designated timelines." P. Br. 5 (citing P. App. 265). But this statement, which comes from a section of her 2016 annual review in which she received a 2.0 out of 5, is only the positive portion of a less-than-glowing whole:

> [Davis] met her assigned goals regarding completing consumer
> disputes within designated timelines to ensure team stayed in
> compliance with FCRA regulations. However, she had
> numerous incorrect responses throughout the year, requiring
> reworking of disputes and additional communications sent to
> consumers and clients. She met weekly deadlines in turning in
> her documentation to management, but struggled with accuracy
> and completeness.

P. App. 265-66. Despite the review's acknowledgment that "[Davis] did show improvement in these areas at the of 2016," after "implementation of a performance improvement plan in November," and other moderately positive sections, the review as a whole does not support Davis' contention that she had "good job performance." *See, e.g., Pollak v. Lew,* 542 Fed. Appx. 304, 307 (5th Cir. 2013) (per curiam) (noting that receiving a "3.0/5.0 in most categories [with] comments about existing deficiencies" is not evidence of a "good performance evaluation[]").[10] In fact, compared to McCoy's assessment of her performance, Davis had an inflated view, giving herself an overall rating of "4.00 Exceeds Expectations"

---

[10]Davis received a "Meets Expectations" rating for "Client Focus," and McCoy stated that Davis "exerted good effort and worked extra hours to minimize backlog;" she "responded promptly to expedited requests;" and "str[ove] to produce positive results" with "an excellent attendance record in 2016." P. App. 266. Davis also received a "Meets Expectations" rating for "Process Improvement" by "adapt[ing] well to numerous changes in processes throughout the year with no issues," learning new tools, reducing the workload for team members, working with data providers to test a new web interface, and providing faster response times. *Id.* at 267. Nevertheless, Davis also received an "Approaches Standards," 2-out-of-5 rating, for "Collaboration," wherein McCoy explained that "[s]he struggled in establishing relationships in internally and did not always maintain the open communications with the [O]perations team that is necessary," and that "her case investigation documentation was lacking[.]" *Id.* Despite some positive comments and ratings, the overall rating of 2.50, "Approaches Standards," suggests that her performance did not meet RealPage's legitimate expectations.

versus McCoy's overall rating of 2.50, i.e., a scorer lower than "Meets Expectations."  D. App. 37-38.

Davis also presents the declaration of Herman, a non-manager operations specialist, who avers that she "found [Davis'] work to be well done and of high quality," and that she and Davis "often worked overtime hours every week" and would work "many more hours of overtime than the other employees that worked in our departments."  P. App. 441.[11]  But this declaration does little to demonstrate pretext.  "[E]ven an incorrect belief that an employee's performance is inadequate constitutes a legitimate, nondiscriminatory reason," and "[a] dispute in the evidence concerning . . . job performance does not provide a sufficient basis for a reasonable fact finder to infer that [the] proffered justification is unworthy of credence."  *Cruz v. Mattis*, 2017 WL 6381741, at *5 (N.D. Tex. Dec. 14, 2017) (Fitzwater, J.) (quoting *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995)).  Herman's statement merely disputes the underlying facts concerning Davis' performance, but it would not permit a reasonable jury to find that McCoy's evaluation of Davis' performance, the PIP, or the written warnings were motivated by discriminatory animus.  In other words, Davis' assertions of her own alleged "good performance" are insufficiently supported by the record and do not create a genuine fact issue concerning RealPage's allegedly pretextual motives.

---

[11]RealPage objects to portions of Herman's declaration as inadmissible hearsay. Because the court is not relying on these portions in making its decision, it need not address the objections.

Davis' allegation that RealPage failed to follow its own established procedures and failed to document poor performance is equally unavailing. Davis contends that RealPage placed her on a PIP without "any written warnings," despite the fact that "RealPage's progressive discipline policy provides for verbal and written warnings prior to placement on a [PIP]." P. Br. 12. She contends that RealPage's failure to comply with its own policies, coupled with its failure to document performance issues in 2015 and 2016, demonstrates pretext.

As a preliminary matter, RealPage's progressive discipline policy does not *require* written warnings before placing an employee on a PIP. Under the policy, "RealPage reserves the right to determine the appropriate level of discipline for any inappropriate conduct, including verbal and written warnings, suspension without pay, demotion and discharge." P. App. 251. And RealPage "reserves the right to combine or skip steps in the progressive discipline policy depending on the facts of each situation." *Id.* Moreover, assuming *arguendo* that RealPage failed to follow its own procedures and did not document Davis' poor performance, such failures, without more, do not demonstrate pretext. "Although an 'employer's failure to follow its own policies may be probative of discriminatory intent,' [the Fifth Circuit] requires discharged employees in discrimination cases to show, in addition, that they were treated differently from non-minority employees." *Hamilton v. AVPM Corp.*, 593 Fed. Appx. 314, 321 (5th Cir. 2014) (per curiam) (quoting *Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 336 (5th Cir. 2005)). This is because anti-discrimination laws "do[] not

protect employees from the arbitrary employment practices of their employer, only their discriminatory impact." *Id.* at 322. The only comparator Davis points to—Castillo—is also African-American, and Davis has presented no evidence of Castillo's—or any other employee's—national origin. Davis has therefore failed to show that she was treated differently from any employee who was not a member of the protected class, and, ultimately, to raise a genuine fact issue on the essential element of pretext.

5

Davis maintains that McCoy "was untruthful about whether he found her protected conduct 'disruptive' to the department," as evidenced by Hepler's testimony that "he did, but he denied it." P. Br. 31. This does not demonstrate an inference of pretext because it is not supported by summary judgment evidence.

When asked "why [McCoy and Bonner] were interested in taking some steps against Ms. Davis following the complaint of Mr. Mc[L]aurin on March 18th, 2017," Hepler responded that this was "[b]ecause of the disruption to the work operations [that Davis] was causing." P. App. 315. In other words, Hepler testified that Davis' conduct—i.e., her following McLaurin—caused disruptions, not that her *protected conduct*, that is, complaints of alleged harassment, caused disruptions. Indeed, when McCoy was asked whether Davis' "*complaints* [were] becoming disruptive in [his] department," McCoy answered, "No." *Id.* at 150 (emphasis added).

Even assuming *arguendo* that McCoy did find her complaints to be disruptive, this evidence does not support a finding of pretextual animus as it relates to her *discrimination*

claim because it does not tend to show that she was terminated on the basis of her race or national origin.

6

Davis also contends that "the fact [that] a decision to terminate [her] was made prior to the issuance of a written warnings purported to precede the termination decision" and "Hepler's evasiveness about it" demonstrate pretext. P. Br. 31. To the extent Davis relies on Hepler's March 20, 2017 email to demonstrate that RealPage had already decided to terminate her employment, such a conclusion is purely speculative. Hepler informed Bonner that she and McCoy "had discussed on Friday next steps," and that Bonner should "proceed business as usual while [they] continue[d] to look into the matter." P. App. 382. It is not clear from this email that Hepler or McCoy had decided to terminate Davis' employment. Likewise, the fact that "new hires" sat with Davis prior to her termination is not evidence of pretext, especially absent some evidence that these hires replaced her. Thus Davis' "speculation," and her "own subjective belief of discrimination, however genuine," including her belief that RealPage had already decided to terminate her employment, without more, is "insufficient to demonstrate pretext." *EEOC v. Omni Hotels Mgmt. Corp.*, 516 F.Supp.2d 678, 704 (N.D. Tex. 2007) (Stickney, J.) (citing *Little*, 924 F.2d at 96).

Moreover, Hepler's alleged "evasiveness" about the order of events is insufficient to create a genuine dispute of material fact as to pretext. *See, e.g., Ward v. Midwestern State Univ.*, 217 Fed. Appx. 325, 328 (5th Cir. 2007) (per curiam) (rejecting plaintiff's contention that employer's "purposefully vague" statements raised inference of pretext where employer

otherwise gave "clear and reasonably specific reasons for [its] actions"). Because "[c]onclus[ory] allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial," *id.*, and Davis has offered nothing other than her own speculation regarding Hepler's meaning of "next steps," the court concludes that the alleged motives for the written warning prior to her termination do not support an inference of pretext.

7

Davis contends that "no adequate investigation was conducted in regard to [her] complaint, which is indicative of discriminatory and retaliatory animus." P. Br. 44. She maintains that "Hepler interviewed some but not all of the alleged harassers and did not interview other employees in the department," but Hepler "was sure to swiftly interview those involved in the complaint against [Davis]," and that "[s]uch lack of adequate investigation pursuant to company policy evidences pretext." *Id.* at 45.

As the court has already pointed out, an employer's failure to comply with company policy, absent evidence that the employee was treated differently from employees outside the protected class, is insufficient to establish discriminatory animus. Davis alleges that RealPage's investigation into her complaint was inadequate compared to those involving complaints against her. Even if this is assumed to be true, the complaints against Davis were made by Maple, McLaurin, and Cyres, each of whom is African-American. In other words, Davis has failed to adduce any evidence that investigations related to complaints by *non-*

*minority* employees were treated differently or more favorably. And because Davis has set forth no competent summary judgment evidence that Maple, McLaurin, and Cyres are non-Kenyan, the comparison of investigations does not demonstrate that non-Kenyans were treated more favorably or that the alleged inadequate investigation into her complaints demonstrates discriminatory animus.

8

Davis also relies on two comments made by Bishop and McCoy as proof of pretext and discriminatory intent. To be relevant evidence considered as part of a broader circumstantial evidence case, "the comments must show: '(1) discriminatory animus (2) on the part of a person that is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decisionmaker.'" *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 475-76 (5th Cir. 2015) (quoting *Squyres v. Heico Cos.*, 782 F.3d 224, 236 (5th Cir. 2015)). Absent these two elements, the comments are simply "stray remarks," not evidence of pretext. *See id.* "Stray remarks are insufficient to enable a claim to survive summary judgment when a plaintiff fails to produce substantial evidence of pretext." *Read v. BT Alex. Brown, Inc.*, 2002 WL 22060, at *4 (N.D. Tex. Jan. 7, 2002) (Fitzwater, J.) (citing *Auguster v. Vermilion Parish Sch. Bd.*, 249 F.3d 400, 404-05 (5th Cir. 2001)), *aff'd*, 72 Fed. Appx. 112 (5th Cir. 2003).

Assuming *arguendo* that Bishop's comment regarding Davis' hair could be construed as containing discriminatory animus, Bishop was not Davis' manager, and Davis has not presented any evidence from which the court can conclude that he had any authority over her

termination or influence over McCoy. For these reasons, Bishop's comment is not relevant evidence of pretext. And although McCoy was the manager responsible for Davis' termination, his isolated comment referring to "where [she] come[s] from" is only vaguely related to her national origin and therefore an insufficient display of "discriminatory animus." *See, e.g., Winter v. Bank of Am., N.A.*, 2003 WL 23200278, at *9 (N.D. Tex. Dec. 12, 2003) (Lindsay, J.) (holding that employer's comments that plaintiff's "accent was too prominent" or that "she suspected a Nigerian client . . . [as] the subject of a fraudulent wire transfer that originated in Nigeria" were stray remarks). These "stray remarks" are insufficient to create a genuine issue of material fact on the requirement that Davis show pretext.

9

As to Davis' remaining evidence of pretext—including the close timing and alleged differential treatment between Davis and Caucasian disputes investigators—neither demonstrates discriminatory animus. Although potentially probative of *retaliatory* intent, proximal timing does not establish pretext as to Davis' *discrimination* claim because close timing between protected conduct and an adverse employment decision does not of itself indicate that the employer acted with *discriminatory* intent. Moreover, as already established, Castillo is African-American, and there is no evidence that she is non-Kenyan, so Davis lacks evidence of disparate treatment based on race and/or national origin.

10

The court concludes that there exists no genuine issue of material fact with respect to whether the reasons articulated by RealPage are false or that discrimination based on Davis'

race and/or national origin was actually the motivating factor in the employment decision in question. This conclusion "is bolstered by the fact that the same actor"—McCoy—was "responsible for both recommending" Davis' "hiring and . . . termination[.]" *Reed v. Madison County*, 2017 WL 4508892, at *6 (S.D. Miss. May 9, 2017) (citing *Spears v. Patterson UTI Drilling Co.*, 337 Fed. Appx. 416, 421-22 (5th Cir. 2009) (per curiam)), *aff'd*, 703 Fed. Appx. 349 (5th Cir. 2017). But because the court need not do so to grant RealPage's motion, it has not relied on the same actor inference in deciding this motion.

G

Having concluded that Davis has failed to establish a prima facie case of race and/or national origin discrimination or to present a genuine issue of material fact on the essential element of pretext, the court grants RealPage's motion as to Davis' claims for race and national origin discrimination under § 1981 and the TCHRA.

IV

The court now considers Davis' claims under § 1981 and the TCHRA for harassment (i.e., hostile work environment) based on race and national origin.

A

Davis alleges that she was harassed based on her race and national origin, in violation of § 1981 and the TCHRA.

RealPage contends that this claim fails because none of the alleged harassment on which Davis relies affected a term, condition, or privilege of Davis' employment. It also

posits that there is no evidence that the allegedly harassing conduct was based on her race.[12]

B

Generally, to establish a prima facie case of a hostile work environment, a plaintiff must show the following:

> (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based on race [or national origin]; (4) the harassment complained of affected a term, condition, or privilege of employment; [and] (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action.

*Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002) (citations omitted).[13]

Regarding the third element, "[h]arassment is based on race if 'the complained-of conduct had a racial character or purpose.'" *King v. Enter. Leasing Co. of DFW*, 2007 WL 2005541, at *10 (N.D. Tex. July 11, 2007) (Fitzwater, J.) (quoting *Harris-Childs v. Medco Health Sols., Inc.*, 2005 WL 562720, at *6 (N.D. Tex. Mar. 10, 2005) (Means, J.)). The plaintiff must demonstrate a "connection between the allegedly harassing incidents and [her] protected status." *Id.* (citation omitted).

---

[12]It appears that RealPage does not make a similar argument related to Davis' national origin. *See* D. Br. 20-21 (arguing that Davis lacks evidence that alleged harassment was based on her race, but contending on other grounds that the claim fails to the extent based on her national origin); P. Br. at 32 (stating that "Defendant asserts that Davis fails to present evidence that the harassment conduct against her was due to race.").

[13]The fifth element need not be established if the harassment is allegedly committed by the victim's supervisor. *Wooten v. Fed. Express Corp.*, 2007 WL 63609, at *19 (N.D. Tex. Jan. 9, 2007) (Fitzwater, J.) (citing *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 353-54 (5th Cir. 2001)), *aff'd*, 325 Fed. Appx. 297 (5th Cir. 2009).

Regarding the fourth element,

> [h]arassment affects a term, condition, or privilege of employment if it is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. Workplace conduct is not measured in isolation. In order to deem a work environment sufficiently hostile, all of the circumstances must be taken into consideration. This includes the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. To be actionable, the work environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.

*Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012) (citations and internal quotation marks omitted). "A hostile work environment exists 'when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 328 (5th Cir. 2009) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)).

> The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing . . . and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81-82 (1998). Merely offensive conduct is not actionable. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). "[T]he

Supreme Court has warned that these high standards are intentionally demanding to ensure that Title VII does not become a general civility code, and when properly applied, they will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language." *Howard v. United Parcel Serv., Inc.*, 447 Fed. Appx. 626, 632 (5th Cir. 2011) (per curiam) (citations and internal quotation marks omitted) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

When determining whether a plaintiff has been subjected to a hostile work environment, the court focuses on factors such as the frequency of the conduct, the severity of the conduct, the degree to which the conduct was physically threatening or humiliating, and the degree to which the conduct unreasonably interfered with an employee's work performance. *See, e.g., Ramsey*, 286 F.3d at 268.

> The question for the jury is not whether the racial conduct at issue was appropriate in the workplace or deserves condemnation. The issue is whether, under the totality of the circumstances, the conduct was severe and pervasive enough to alter the terms and conditions of employment and create an abusive working environment.

*Jones v. Dallas County*, 47 F.Supp.3d 469, 491 (N.D. Tex. 2014) (Fitzwater, C.J.). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris*, 510 U.S. at 21.

The court considers first whether Davis has presented sufficient evidence for a reasonable jury to find that she was subjected to harassment based on her race.[14]

Davis seems to recognize in her brief that, to establish a prima facie case, she must prove that "the harassment complained of was based on race," P. Br. 32, and that RealPage is arguing that Davis cannot satisfy this element. *Id.* ("Defendant asserts that Davis fails to present evidence that the harassment conduct against her was due to race."). She then appears to respond to this argument by positing that harassment based on race can be proved if a victim of one race is subjected to disadvantageous terms or conditions of employment to which those outside the protected category are not.

As noted above, "[h]arassment is based on race if 'the complained-of conduct had a racial character or purpose.'" *King*, 2007 WL 2005541, at *10. There must also be a "connection between the allegedly harassing incidents and [the plaintiff's] protected status." *Id.* But where, as here, harassing conduct of a patently racial nature is not involved (e.g., the presence of racially offensive graffiti in the workplace), there must be sufficient evidence of another type of conduct for a reasonable jury to find that the harassment had a racial character or purpose. For example, if harassing conduct such as slashing car tires, trashing work lockers, and similar conduct were only directed at African-American plant workers, a reasonable jury could find that this conduct had a racial character or purpose even though not

---

[14]*See supra* note 12 for why the court is addressing only a hostile work environment based on race rather than race and national origin.

inherently racial in character or purpose.[15]

But this is not Davis' evidence.  Davis' hostile work environment claim essentially rests on this flimsy premise: if a plaintiff is African-American and she is stalked by coworkers, it is reasonable to infer that the conduct taken toward her was based upon her race.  This is not a reasonable inference in this case considering that most of the coworkers whom she accuses of stalking her or staring at her (i.e., Cyres, Bagsby, McLaurin, Castillo, and Maple) are *African-American*.[16]

The court thus holds that Davis has not satisfied the third element of a prima facie case of a racially hostile work environment.

## D

But even if Davis can satisfy the requirement that she was subjected to harassment based on her race, and even in the absence of a challenge to the assertion that she was harassed based on her national origin, she must still produce sufficient evidence for a reasonable jury to find that she was subjected to a hostile work environment at all—whether based on race and/or national origin.

---

[15]The court has not included all the details of what would be necessary for a hostile work environment because its focus is on whether the conduct had a racial character or purpose.  For purposes of this example, the court assumes that the conduct was severe and pervasive enough to alter the terms and conditions of employment and create an abusive working environment.

[16]The court does not suggest that this is a *per se* bar to Davis' clam.  *Cf. Oncale*, 523 U.S. at 80 (holding that same-sex harassment claim is cognizable where evidence shows that harasser of the same sex is motivated by "general hostility to the presence of [that same sex] in the workplace").

In her response brief, Davis relies on the following proof to show that she was subjected to a hostile work environment: "she was singled out to be intentionally 'followed,' or stalked, all around the premises continuously for the entire period of her employment and even harassed at her desk," P. Br. 33; her work was sabotaged, *id.*; and comments were made about her native appearance and national origin, *id.* The court holds that the evidence is insufficient for a reasonable jury to find that Davis was subjected to an objectively hostile work environment.

As for Davis' reliance on evidence that she was intentionally followed, stalked, and harassed at her desk, the proof would only enable a reasonable jury to find the following: over the course of approximately 21 months while Davis worked at RealPage, Cyres (an African-American male) sometimes followed Davis when she went for walks outside while on break, and he sometimes waited for Davis in the parking garage when she got to her car; Davis once observed Maple (an African-American female) looking at her; on one occasion Boyst, Castillo (an African-American female), Cyres (an African-American male), Kennedy, Khulik, and three others took turns following her on her walk break, to the restroom, and to the escalator; unnamed persons who had previously followed Davis followed her to the restroom, waited for her in the parking lot, and waited for her in the elevator approximately twice a day, every other day, for six months, and when Davis returned to her desk, persons would burst out laughing and say, "Oh, just checking"; Bagsby (an African-American female) began following Davis, and, approximately every other day, Bagsby parked in front of Davis' car and sat in her car and stared at Davis as she exited her car; when Davis went

to the parking garage to go home or to lunch, she sometimes noticed Cyres and Kennedy sitting in their cars; employees went out of their way to walk by Davis' desk and distract her; and McLaurin (an African-American male) followed Davis to the coffee station twice, followed Davis down the hall, and two other Operations department employees followed Davis.

The conduct that a jury could reasonably find was frequent—i.e., the following—was not severe, physically threatening, or humiliating. And any conduct that a reasonable jury could find was severe was infrequent. *See, e.g., Mack v. John L. Wortham & Son, L.P.*, 541 Fed. Appx. 348, 357 (5th Cir. 2013) (per curiam) (holding that plaintiff was not subjected to a hostile work environment where the complained-of actions were "infrequent, isolated incidents"). And no reasonable jury could find that the conduct in question created an objectively hostile work environment. *See, e.g., Ayissi v. Kroger Tex. LP*, 2012 WL 1936561, at *4 (S.D. Tex. May 29, 2012) (holding that another employee "follow[ing] [plaintiff] around the store" and "try[ing] to come [her] way" was insufficiently severe or pervasive); *Wilkinson v. Potter*, 236 Fed. Appx. 892, 893 (5th Cir. 2007) (per curiam) (holding that "short, almost daily periods where [another employee] stared at her," "unnecessary appearances by [another employee] in her work area," and "instances where [another employee] would follow her" were insufficient to establish "an objectively hostile work environment"). The law protects against *hostile* work environments, not merely unpleasant ones in which an employee feels mistreated, not liked, or not accepted. *See McConathy v. Dr. Pepper/Seven Up Corp.*, 131 F.3d 558, 564 (5th Cir. 1998) ("It is a simple

fact that in a workplace, some workers will not get along with one another, and this Court will not elevate a few harsh words or "cold-shouldering" to the level of an actionable offense.").

In support of her assertion that her work was sabotaged, Davis relies on evidence that, when she was working on a case, she reported that an applicant was innocent, but someone changed the file to reflect the disposition as guilty. McCoy discovered—and Boyst admitted—that Maple (Boyst's team lead) had changed the file. P. Br. 33; P. App. 34-35. This evidence, alone or in combination with Davis' other proof, is insufficient for a reasonable jury to find that Davis was subjected to a hostile work environment.[17]

The evidence Davis cites about comments made about her native appearance and national origin is this: Once, when Davis was wearing braided hair, Bishop said something to the effect, "How do you all do this?" after which he and McCoy laughed or smiled. P. Br. 33; P. App. 79. On another occasion, after Davis finished a file, she wrote "done," or sent an email saying "done," as was her usual practice. McCoy came by her desk and commented, "You shouldn't be saying that or maybe it's because of where you are from." P. Br. 33; P. App. 112. This evidence is woefully insufficient for a reasonable jury to find that Davis was subjected to a hostile work environment. *See, e.g., Brooks v. Firestone Polymers, LLC*, 70 F.Supp.3d 816, 858 (E.D. Tex. 2014) (quoting *Faragher*, 524 U.S. at

---

[17]Davis cites pages 447-48 of her appendix to support her allegation that her work was sabotaged. But Davis' appendix ends at page 446. For this reason, the court disregards such allegations.

788) ("'[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"), *aff'd*, 640 Fed. Appx. 393 (5th Cir. 2016).

The court therefore holds that RealPage is entitled to summary judgment dismissing Davis' hostile work environment claim.

V

Finally, the court considers Davis' retaliation claims under § 1981 and the TCHRA.

A

Davis alleges that RealPage retaliated against her, in violation of § 1981 and the TCHRA, for complaining of discrimination to RealPage's human resources personnel and the EEOC. She bases this claim on McCoy's decision to terminate her employment.

RealPage maintains that Davis cannot establish a prima facie because there is no evidence that McCoy was aware that Davis had engaged in protected activity before he decided to terminate her employment, and Davis cannot prove but-for causation.

B

Because Davis relies on circumstantial evidence to support her retaliation claim, she must proceed under the *McDonnell Douglas* burden shifting framework. Davis must first demonstrate a prima facie case of retaliation by showing that (1) she engaged in a protected activity, (2) an adverse employment action occurred, and (3) a causal link existed between the protected activity and the adverse employment action. *See Walker v. Norris Cylinder Co.*, 2005 WL 2278080, at *9 (N.D. Tex. Sept. 19, 2005) (Fitzwater, J.) (citing *Long v.*

*Eastfield Coll.*, 88 F.3d 300, 304 (5th Cir. 1996)).  As to the third element, the requirement that a plaintiff show at the prima facie case stage a "causal link" between a protected activity and an adverse employment action is "much less stringent" than the "but for" causation that the trier of fact must find.  *See Montemayor v. City of San Antonio*, 276 F.3d 687, 692 (5th Cir. 2001); *see also Khanna v. Park Place Motorcars of Hous., Ltd.*, 2000 WL 1801850, at *4 (N.D. Tex. Dec. 6, 2000) (Fitzwater, J.) (characterizing the prima facie case burden as "minimal").

If Davis establishes a prima facie case, the burden shifts to RealPage to articulate a legitimate, non-retaliatory reason for the action taken.  *See Walker*, 2005 WL 2278080, at *9. This burden is one of production, not of proof.  *See Wooten v. Fed. Express Corp.*, 2007 WL 63609, at *16 (N.D. Tex. Jan. 9, 2007) (Fitzwater, J.), *aff'd*, 325 Fed. Appx. 297 (5th Cir. 2009).

If RealPage meets its production burden, the burden shifts back to Davis to produce evidence that retaliation for her protected conduct, rather than RealPage's proffered legitimate non-retaliatory reason, was the "but-for cause" of the adverse employment action. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013) ("Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action."); *see also, e.g., Coleman v. Jason Pharms.*, 540 Fed. Appx. 302, 304 (5th Cir. 2013) (per curiam) (citing *Nassar*, 570 U.S. at 352) ("An employee establishes pretext by showing that the adverse action would not have occurred 'but for' the employer's retaliatory reason for the action.").  "In order to avoid summary judgment, the plaintiff must

show 'a conflict in substantial evidence' on the question of whether the employer would not have taken the action 'but for' the protected activity." *Coleman*, 540 Fed. Appx. at 304 (quoting *Long*, 88 F.3d at 308).

## C

The court concludes that Davis has made out a prima facie case of retaliation. Davis engaged in protected activity on March 15, 2017, when she emailed Hepler, copied McCoy, and stated: "The harassment has continued . . . . I do plan to take a Personal day off soon to go to the EEOC office to pursue this issue. No employee should be subjected to work in such hostile work environment!" P. App. 369-370.[18] She was subjected to an adverse

---

[18]Davis' contention that her November 2016 PIP gives rise to a retaliation claim fails because she points to no evidence that she engaged in protected activity before the PIP was issued. As evidence of her protected conduct, Davis cites her June 2016 email to human resources, on which McCoy was not copied, wherein she explained that she was being followed. This email "does not itself constitute 'protected activity' within the meaning of [the anti-discrimination laws], as this complaint lacked a racial or [otherwise protected] basis." *Davis v. Dall. Indep. Sch. Dist.*, 448 Fed. Appx. 485, 493 (5th Cir. 2011) (per curiam).

Moreover, even assuming that this email qualifies as protected activity, Davis has not pointed to evidence that would satisfy the causal connection between the complaint and the PIP because she has not demonstrated that McCoy was aware of her protected activity. "If the decision maker was not aware of any protected activity, there can be no causal connection between the protected activity and any adverse employment action taken by that decision maker." *Luna v. Lockheed Martin Corp.*, 54 Fed. Appx. 404, 404 (5th Cir. 2002) (per curiam). McCoy was not copied on the email, and, after discussions with Hepler, he merely understood that Davis was being followed—not that she was being discriminated against. Davis' reliance on her complaints to McCoy in August are equally unavailing because she merely stated that she was uncomfortable, not that she was enduring discrimination or retaliation on the basis of her race or national origin. For this reason, the court focuses its analysis on the protected activity of which McCoy was clearly aware—the March 15, 2017 email—and the following adverse employment action, i.e, her termination two weeks later. And because Davis does not appear to rely on the final written warning as an adverse

employment action when she was terminated on April 3, 2017. The close timing between her engaging in the protected activity (of which McCoy was aware) and her termination is sufficient to establish a causal link at the prima facie stage. *See, e.g., Benton v. EPA*, 2014 WL 2862309, at *5 (N.D. Tex. June 24, 2014) (Fitzwater, C.J.) ("A plaintiff alleging retaliation can satisfy the causal connection element by showing '[c]lose timing between an employee's protected activity and an adverse action against him.'").[19]

RealPage advances several arguments in opposition to Davis' attempt to establish a prima facie case. *See* D. Br. 23-25. While these arguments may have force in the context of but-for causation, they are misplaced at the prima facie case stage, particularly given the much less stringent showing that a plaintiff must make of the causal link between a protected activity and an adverse employment action.

D

Because Davis has made a prima facie showing of retaliation, the burden shifts to RealPage to show a legitimate, non-retaliatory reason for her termination. RealPage has introduced evidence that Davis had continued performance issues. The court thus holds that

---

employment action, the court does not address this event in relation to her retaliation claim.

[19]Davis refers to her fellow employees' increased stalking following her complaint to human resources as "retaliation." But such acts do not give rise to a retaliation claim because they do not constitute an "adverse action." *See, e.g., Ortego v. Dep't of Transp.*, 2014 WL 12521695, at *7 (E.D. La. Feb. 18, 2014) (holding that alleged stalking, among other actions, was insufficient to constitute an adverse action, particularly where an investigation into the stalking showed that the claims were unsubstantiated), *aff'd sub nom. Ortego v. Standige*, 578 Fed. Appx. 414 (5th Cir. 2014).

RealPage has met its burden of production.  *See, e.g., Esparaza v. Bank of Am., N.A.*, 2013 WL 5208024, at *8 (N.D. Tex. Sept. 17, 2013) (Fitzwater, C.J.) (holding that defendant met its burden of articulating legitimate, non-retaliatory reason for its decision based, *inter alia*, on plaintiff's declining and unacceptable performance, about which she had been repeatedly warned).

## E

Because RealPage has met its burden of production, the burden of proof now shifts to Davis.  "At this stage, [Davis'] retaliation claim can only survive summary judgment if she presents evidence that would enable a reasonable trier of fact to find that, but for the protected activity, [RealPage] would not have [terminated] her."  *Cruz*, 2017 WL 6381741, at *8.

As evidence of pretext, Davis relies, in part, on the close timing between her protected conduct and her termination.  But "[m]ere proximity generally does not suffice to establish causation at the pretext stage."  *Id.* at *9 (citing *Dixon v. Comal County*, 447 Fed. Appx. 638, 641-42 (5th Cir. 2011) (per curiam)); *see also Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 656 (5th Cir. 2004) ("Without more than timing allegations, and based on [defendant's] legitimate, nondiscriminatory reason in this case, summary judgment in favor of [defendant] was proper.").  Instead, Davis must "point[] to enough evidence beyond temporal proximity to create a genuine issue of material fact about pretext."  *Garcia v. Prof'l Contract Servs., Inc.*, 938 F.3d 236, 244 (5th Cir. 2019).

"[E]vidence of temporal proximity combined with positive performance reviews" has

been deemed insufficient "to create a genuine issue of material fact about pretext." *Id.* (citing *United States ex rel. King v. Solvay Pharms., Inc.*, 871 F.3d 318, 324 (5th Cir. 2017)). And as the court has explained above, *see supra* at § III(F)(3), Davis has not introduced sufficient evidence of positive performance reviews.

"Temporal proximity" combined with, among other things, the plaintiff's "dispute of the events leading up to her termination," and evidence that "employees . . . did not receive negative reviews even though they had the same problems that the plaintiff received poor reviews for" may be sufficient to raise a fact issue as to retaliatory pretext. *Garcia*, 938 F.3d at 244. But while "evidence of disparate treatment between employees may be relevant to the pretext inquiry, . . . a plaintiff who proffers the treatment of fellow employees as evidence of pretext must show that those employees were similarly situated to the plaintiff." *Moore v. Brennan*, 794 Fed. Appx. 374, 380 (5th Cir. 2019) (per curiam) (citing *id.*) (holding that disparate treatment failed to establish pretext as to plaintiff's retaliation claim where plaintiff "provided no evidence regarding his fellow employees").

Davis disputes the degree of the disruption she created within the Operations department, but she does not deny following McLaurin. And while Davis contends that RealPage retaliated against her by terminating her employment as soon as McLaurin "sa[id] [she] followed them" after "complain[ing] for a year and a half that [she] was being followed," D. App. 25, Davis has introduced no evidence that would enable a reasonable jury to find that McLaurin was similarly situated. Indeed, the only record evidence demonstrates that Davis and McLaurin were not similarly situated. He was a temporary employee who

reported the alleged incident to Bonner, not McCoy.  Because there is no evidence that Davis and McLaurin were similarly situated, the alleged disparate treatment between Davis and McLaurin is insufficient to raise a material fact issue as to retaliatory pretext.  *See Moore*, 794 Fed. Appx. at 380; *see also Mumfrey v. CVS Pharm., Inc.*, 719 F.3d 392, 405 (5th Cir. 2013) (holding that for "disparate treatment" to evidence pretext, "the situation and conduct of the employees must be 'nearly identical,'" including job responsibilities and disciplinary records).

Likewise, none of the remaining proffered evidence is sufficient to raise an inference of pretext.  Davis relies on the same evidence as she offered in support of her discrimination claim.  But as the court has already discussed, *see supra* § III(F)(3), there is insufficient evidence to demonstrate that Davis had good performance.  And despite Davis' allegations that RealPage did not follow its own procedures, RealPage's procedures did not *require* a certain order of steps, and, to the extent it did, Davis received a proper escalation of PIP, subsequent warning, and ultimate termination.

Nor does the evidence support Davis' assertion that McCoy was dishonest about whether he found her protected conduct to be disruptive to the department, or that RealPage's decision to terminate her employment occurred before issuing the written warning.  To the extent Davis relies on disparate treatment, she has failed to demonstrate that the employees allegedly treated more favorably were similarly situated.  And "even if plaintiff could establish that [RealPage] failed to adequately investigate her concerns . . . , a lack of thoroughness or failure to conduct additional investigation does not constitute 'significant

evidence of pretext' in this case." *Devere v. Forfeiture Support Assocs., L.L.C.*, 2014 WL 4471392, at *6 (S.D. Tex. Sept. 10, 2014) (addressing pretext in retaliation context), *aff'd*, 613 Fed. Appx. 297 (5th Cir. 2015).

Because Davis has failed to create a dispute of material fact as to pretext, the court grants RealPage's motion as to Davis' retaliation claim.

F

Alternatively, even if RealPage is not entitled to summary judgment on the ground that Davis has failed to raise a genuine fact issue as to pretext, it would still be entitled to summary judgment on another basis: Davis has at most created only a weak issue of fact, and there is abundant, uncontroverted evidence that no retaliation occurred, particularly given the documented performance issues, Davis' repeated complaints to human resources that did not trigger retaliatory acts, and Davis' failure to dispute most of the events leading up to her termination. *See Payne v. Univ. of S. Miss.*, 643 Fed. Appx. 409, 411 n.6 (5th Cir. 2016) (per curiam) (applying "weak issue of fact" standard to retaliation cases).

Davis was terminated on April 3, 2017. McCoy became aware of Davis' engaging protected conduct on March 15, 2017. But *before* March 15, 2017—in an Annual Performance Review with a March 1, 2017 effective date—McCoy gave Davis an overall rating of 2.50, i.e., "Approaches Standards," which was lower than "Meets Expectations." In that appraisal McCoy identified several perceived deficiencies in Davis' performance. And even before that, on November 14, 2016, McCoy placed Davis on a PIP. For a reasonable jury to find that Davis' engaging in protected conduct as of March 15, 2017 was

the but-for cause for McCoy's terminating her, it would have to disregard, or assign little weight to, his documented criticisms of her work performance that predated March 15, 2017. And it would have to do the same regarding McCoy's assessment of Davis' conduct involving McLaurin, which occurred after McCoy became aware of Davis' protected conduct but before he terminated her. Considering the issues that McCoy had with Davis' performance *before* March 15, 2017, a reasonable jury could not find that her engaging in protected conduct was the but-for cause of her termination on April 3, 2017.

For these reasons, the court grants RealPage's motion for summary judgment as to Davis' retaliation claims under § 1981 and the TCHRA.

\* \* \*

Accordingly, the court grants Real Page's motion for summary judgment and dismisses this action with prejudice by judgment filed today.

**SO ORDERED**.

March 20, 2020.



SIDNEY A. FITZWATER
SENIOR JUDGE